UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

WILFREDO MEJIA,

    *Defendant.*

Case No. 1:10-cr-00256-RCL-3

## MEMORANDUM OPINION

In December 2009, defendant-movant Wilfredo Mejia, a member of the violent street gang MS-13, orchestrated the armed robbery of a Washington, D.C., bordello. Proffer at 9–10, ECF No. 217. Mejia hoped to rob any patrons then inside and to force the bordello "to begin paying rent to MS-13." *Id.* at 9. Mejia drove four gang members to the site, and he waited in the getaway vehicle as his associates tied up the bordello's patrons and assaulted them with a gun and a knife. *Id.* A few minutes into the gangsters' shakedown, however, the police arrived. *Id.* at 10. Officers managed to apprehend three of the perpetrators, but Mejia and his fourth associate slipped away. *Id.* at 10. A few months later, they too were arrested. *Id.*

In November 2011, the United States obtained a superseding indictment against Mejia that charged him with twenty-three felonies arising from the bordello incident: RICO conspiracy, kidnapping in aid of racketeering and aiding and abetting the same, four counts of kidnapping while armed in aid of racketeering and aiding and abetting the same, five counts of assault with a dangerous weapon in aid of racketeering and aiding and abetting the same, five counts of armed robbery, five counts of kidnapping while armed, first-degree burglary while armed, and possession of a firearm during and in relation to a crime of violence and aiding and abetting the

1

same. Third Super. Ind., ECF No. 101. On July 20, 2012, Mejia and the government reached a plea agreement. Plea Agreement, ECF No. 216. Mejia would admit his guilt as to all counts and would enter a plea of guilty to Counts 1 (RICO conspiracy) and 23 (possession of a firearm during and in relation to a crime of violence), in exchange for the government's recommendation of a 141-month sentence of imprisonment. *Id.* Mejia signed that agreement and the government's factual proffer in support thereof, ECF No. 217, and he allocuted to the crimes charged in the indictment before the Court on the same day. *See* Appendix A. On October 5, 2012, the Court, Judge Rosemary M. Collyer presiding, sentenced Mejia to the agreed-upon 141 months' confinement. Min. Entry of 10/05/2012.

Mejia now challenges his conviction for Count 23, possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Supp. Mot. at 3, ECF No. 662. In 2016, Mejia filed an "abridged," one-page motion under 28 U.S.C. § 2255 to vacate that conviction under the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), which invalidated the so-called "residual clause" of the Armed Career Criminal Act (ACCA). Mejia filed a "supplement" to that motion on June 3, 2020, setting forth his legal arguments. ECF No. 671. The United States responded on September 9, ECF No. 671, and Mejia replied on September 24. ECF No. 672. The United States filed an unauthorized sur-reply on October 7, ECF No. 673, and Mejia retorted with an unauthorized sur-sur-reply on October 16. ECF No. 675. For the reasons discussed below, however, Mejia's motion to vacate no longer presents a live case or controversy under Article III, § 2 of the United States Constitution. Accordingly, his motion shall now be **DISMISSED AS MOOT.**

## I. BACKGROUND

The Supreme Court has characterized the violation of § 924(c)(1) as a "combination crime." *Rosemond v. United States*, 572 U.S. 65, 75 (2014). That is, a defendant commits a § 924(c)(1) offense when he commits some *other* crime (the "predicate crime") and, while so doing, possesses a firearm. *Id.* Section 924(c)(1) also specifies that that predicate must be a "crime of violence." § 924(c)(1). Section 924(c)(3), in turn, formerly defined "crime[s] of violence" as those that have "physical force" as an element of the offense (the so-called "elements clause"), and those that, "by [their] nature, involve[] a substantial risk [of the use of] physical force" (the so-called "residual clause"). § 924(c)(3)(A)–(B). In 2015, the Supreme Court invalidated a similarly-worded residual clause found in the ACCA. *See Johnson*, 576 U.S. at 606. And building upon that decision, it later invalidated the residual clause directly relevant to Mejia's case—§ 924(c)(3)(B). *See United States v. Davis*, 139 S. Ct. 2319 (2019). Thus, in the wake of *Davis*, predicate crimes for § 924(c)(1) offenses must require the use of physical force against another as an element. And under a related Supreme Court precedent, that requisite "physical force" must be *violent* physical force, rather than merely offensive touching. *See Curtis Johnson v. United States*, 559 U.S. 133 (2010).

The supplemental brief Mejia filed on June 3, 2020 sought to invalidate his § 924(c)(1) conviction by invoking those precedents. Supp. Mot. at 3, ECF No. 662. It conceded that Mejia's § 924(c)(1) offense was predicated upon at least one valid crime of violence (assault with a dangerous weapon), but claimed that it was also based on other invalid predicates, like kidnapping, that are not always crimes of violence. *Id.* It then set forth a convoluted argument that the Court must presume, under the "modified categorical approach," that solely the invalid predicates supported the § 924(c)(1) conviction, and thus that Mejia's conviction for Count 23

3

was void. *Id.* at 11–12. The government's response, filed on September 9, 2020, countered that assault with a dangerous weapon remains a valid predicate, and thus that Mejia's § 924(c)(1) conviction still stands. Opp'n at 1, ECF No. 671. And it further claimed that Mejia was procedurally barred due to his failure to assert a void-for-vagueness challenge on direct appeal. *Id.* at 11–13.

In his September 24 reply, Mejia's counsel then raised what were admittedly new arguments. Reply at 1, ECF No. 672. Counsel explained that he had "initially overlooked a critical document—the government's proffer of proof in support of the [sic] Mr. Mejia's guilty plea[.]". *Id.* Counsel explained that the government's proffer stated that had the case gone to trial, the government could have proven that the "[d]efendant committed the crime of armed robbery." *Id.* at 1; *see also* Proffer at 2, ECF No. 217. Thus, counsel reasoned, the proffer's reference to "armed robbery" meant that Mejia's § 924(c)(1) offense was predicated solely upon the crime of D.C. armed robbery pleaded at Counts 4, 8, 12, 16, and 20 of the third superseding indictment. Third Super. Ind., ECF No. 101. And because D.C. armed robbery is apparently not a crime of violence, counsel urged that Mejia's § 924(c)(1) conviction thus lacked a valid predicate. Reply at 1–2, ECF No. 672. Without obtaining leave of court, the government filed a sur-reply objecting to Mejia's new arguments and contending that they, too, were procedurally barred and meritless. Sur-Reply, ECF No. 673. Mejia's counsel then filed an unauthorized sur-sur-reply, further propounding Mejia's novel arguments about the proffer and disputing the government's claims about harmless error and procedural bar. Sur-Sur-Reply, ECF No. 675.

As the parties exchanged broadsides in their billowing submissions, neither apparently gave much thought to the issue of mootness. Mejia's counsel pointed out in his June 3 "supplement" that Mejia was "set to be released from custody on June 5, 2020." Supp. Mot. at 5,

4

ECF No. 662. But, counsel argued, "[h]is release from custody does not render the matter moot[,] because he still has an invalid § 924(c) conviction that must be vacated."[1] *Id.* at 5 n.1. The government later represented that Mejia was "on supervised release after completing the incarceration term of his sentence." Opp'n at 1, ECF No. 671. Mejia plainly would have possessed a litigable interest in the duration of his supervised release, and thus an interest in the validity of his § 924(c)(1) conviction, had the government's statement been accurate.

As it turns out, though, it was not. Mejia, a native of El Salvador, originally was present in the United States on a green card, and, after his arrest, was subject to a detainer from the Department of Homeland Security. Final PSR at 2, ECF No. 243. After committing his string of felonies, Mejia became a deportable alien under the terms of the Immigration and Nationality Act. *See* 8 U.S.C. § 1227. Unsurprisingly, the Court was eventually advised that after his release from custody, Mejia was deported from the United States on June 12, 2020—just nine days after the filing of his § 2255 petition and several months before the submission of the parties' later, voluminous briefing. Joint Dec., ECF No. 667. For the reasons explained below, Mejia's removal, combined with his unchallenged felony conviction for RICO conspiracy and his admission to having committed other, serious felonies, moots his present objection to his § 924(c)(1) conviction.

## II. LEGAL STANDARD

Article III, § 2 of the federal Constitution provides that the "judicial Power shall extend" to "cases" and "controversies." U.S. Const., Art. III, § 2. From that provision, the Supreme Court has derived a variety of "justiciability" doctrines that operate to constrain the subject-matter jurisdiction of Article III courts. *See* Richard H. Fallon, Jr., et al., *The Federal Courts and the*

---

[1] As explained below, that depiction of mootness is incorrect. The mere fact of an invalid conviction without an independent, cognizable injury cannot sustain an Article III case or controversy.

*Federal System* 49 (7th ed. 2015). Federal courts may not opine through "advisory opinions" on abstract questions of law divorced from real-world disputes. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.") (internal quotation marks omitted). Rather, the plaintiff to an action in federal court "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *United States v. Juvenile Male*, 564 U.S. 932, 938 (2011) (*per curiam*) (quoting *Spencer v. Kenma*, 523 U.S. 1, 7 (1998)).

That injury, or its imminent occurrence, must exist when the action commences—a concept referred to as "standing." *Hartnett v. Penn. State Educ. Assoc.*, 663 F.3d 301, 305 (3d Cir. 2020). And that litigable interest must persist "throughout the litigation." *Spencer*, 523 U.S. at 7. If, during the lawsuit, there ceases to be a concrete injury capable of redress by the court's decision, the case is said to be "moot." *Id.* Because the "judicial power depends upon the existence of a case or controversy," "federal courts are without power" to decide cases in which the parties lack standing or during which the dispute is mooted. *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974). In other words, mootness is a subject-matter jurisdictional defect. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 78–79 (2013). Thus, like other subject-matter jurisdictional defects, this Court is obliged to raise it *sua sponte*. *Gonzales v. Thaler*, 565 U.S. 134, 141 (2012). And if the Court finds subject-matter jurisdiction lacking, it gets no further say; it must dismiss the action. *DeFunis*, 416 U.S. at 316.

## III. DISCUSSION

As the Supreme Court has explained, "[a]n incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction." *Spencer*, 523 U.S. at 7. But "once the convict's sentence has expired . . . some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained." *Id.* Mejia is no longer incarcerated, and thus even if this Court invalidated his § 924(c)(1) conviction, it could not possibly redress the injury of confinement. Thus, to sustain this action, Mejia must demonstrate some *other* litigable interest—some cognizable injury—that this Court could redress with a favorable decision. But as is explained below, the combination of Mejia's removal, his independent felony conviction for RICO conspiracy, and his admission to having committed other, serious felonies, refute the existence of any such redressable injury.[2]

*1. There Is No Longer An Injury From Supervised Release Capable of Redress*

Supervised release, like parole, would constitute a restraint on Mejia's liberty, and thus an injury that could be redressed by a favorable ruling on the present motion. But Mejia is not

---

[2] In the parties' Joint Declaration advising the Court of Mejia's removal, defense counsel points to several cases suggesting that this action is not moot. Joint Dec., ECF No. 677. Those cases are easily distinguished. *United States v. Muskett*, 970 F.3d 1233 (10th Cir. 2020), involved a petitioner out on supervised release, as did *Royer v. United States*, 324 F. Supp. 3d 719 (E.D. Va. 2018), and as did *United States v. Tai*, No. 10-cr-769, 2018 WL 4615972 (E.D. Pa. Sept. 26, 2018). Under *Spencer*, the liberty restriction of supervised release is, indeed, a redressable injury. *Spencer*, 523 U.S. at 7. But, again, Mejia is not on supervised release and is not even in the United States, so these precedents' relevance remains unclear. In *Chong v. District Director, I.N.S.*, 264 F.3d 378, 385–86 (3d Cir. 2001), Chong's ability to re-enter the country hinged on the court's determination whether she had committed an "aggravated felony." By contrast, Mejia cannot re-enter for the litany of *other* crimes he admitted to in his plea, proffer, and allocution, and which he does not even challenge. Thus, irrespective of how this Court ruled on his § 924(c)(1) conviction, it would not alter his ability to re-enter. In *United States v. Rivas-Gonzalez*, 384 F.3d 1034, 1042 (9th Cir. 2004), the defendant-appellant was apparently eligible for re-entry into the United States, and thus faced the possibility of having to serve out his supervised release term after that future re-entry. In this case, Mejia is, once again, permanently barred from re-entry into the United States for reasons other than his § 924(c)(1) conviction. He thus faces no risk of having to serve out his term of supervised release for that conviction.

7

even on supervised release. Rather, he was removed from the United States months ago. There is, accordingly, no longer any restraint on Mejia's liberty from supervised release—and thus no resultant "injury"—that a favorable decision from this Court could redress. That, however, is not the end of the inquiry.

### 2. *There Are No Civil Disabilities Capable of Redress*

As mentioned above, the Supreme Court has held that the mere lapse of a felon's term of imprisonment, parole, or supervised release does not itself moot a collateral attack. *Carafas v. LaVallee*, 391 U.S. 234, 237 (1968). Rather, there may also be "collateral consequences" of the conviction the felon can cite that demonstrate a litigable interest in the petition. *Id.* Such "civil disabilities" might include subjection to laws that restrict certain trades and licenses to non-felons, to laws that bar service as a public official or on a jury, that disfranchise felons from voting, or that bar service in the armed forces. *Id.*; *see also* Note, *Civil Disabilities of Felons*, 53 Va. L. Rev. 403, 403–04 (1967). No evidence in the record suggests that Mejia is suffering from such a disability, that he may suffer from such a disability in the future, or that a favorable decision on his present petition would redress those hypothetical injuries.

First, Mejia has an independent felony conviction for RICO conspiracy that he does not even challenge, and so even if this Court were to invalidate his § 924(c)(1) conviction, he would remain disfranchised by reason of that independent felony. Second, because of his independent felony, deportation, and non-citizen status, Mejia regardless cannot participate in activities like voting, service on a jury, service as a public official, or service in the armed forces. And, third, his RICO conviction and admission to other felonies would bar him from re-entry into the United States regardless of the validity of his § 924(c)(1) conviction. So even if Mejia were to some day sneak into the United States illegally, and then some day attempt to obtain a professional license

8

unavailable to felons, he could not obtain such a license even if his § 924(c)(1) conviction were invalidated. And besides, such "some day intentions"—predicated on yet further, future lawbreaking—are not sufficiently imminent and concrete to establish a litigable interest capable of sustaining federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *Lyons v. City of Los Angeles*, 461 U.S. 95, 102–03 (1983) (noting that litigants are presumed to obey the law).

### 3. Mejia's Bar from Re-Admission Into the United States Is Not Capable of Redress

Relatedly, Mejia's admissions in his factual proffer, plea agreement, and allocution—of having committed kidnapping, kidnapping while armed, assault with a dangerous weapon, armed robbery, and burglary while armed, all in service of the RICO conspiracy for which he was convicted—permanently bar him from re-admission into the United States. *See* 8 U.S.C. § 1182(a)(2)(A)(i)(I) (barring re-admission of aliens convicted of, or who admit commission of, crimes of moral turpitude); *see also Safaryan v. Barr*, 975 F.3d 976, 986 (9th Cir. 2020) (noting that assault with a deadly weapon is "categorically a crime involving moral turpitude"); *Garcia-Gonzalez v. Holder*, 737 F.3d 498, 499–500 (8th Cir. 2013) (noting that the Board of Immigration Appeals considers racketeering itself to be a crime of moral turpitude). Thus, Mejia is permanently barred irrespective of how this Court might rule on the validity of his § 924(c)(1) conviction.

Even if the Court were to invalidate *that* conviction, it could not unwind all of Mejia's admissions in his plea, proffer, and allocution about the *other* crimes he committed and which he does not even now challenge. When a deported alien is permanently barred from re-admission for the commission of other, unchallenged felonies, his petition as to the challenged felony is moot. *Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 408–09 (3d Cir. 2020). Again, even

9

if Mejia's challenged conviction were to fall, the remaining, unchallenged convictions and admissions would result in precisely the same bar against re-entry. *See id.* Since that bar cannot be redressed no matter how this Court rules on his § 924(c)(1) offense, Mejia's petition is moot.

### 4. *"Moral Stigma" From Mejia's § 924(c)(1) Conviction Is Not a Cognizable Injury*

The only other "collateral consequence" feasibly resulting from Mejia's § 924(c)(1) conviction is the abstract "moral stigma" that may have ensued from that judgment. But, problematically for Mejia, the Supreme Court has explicitly held that "the moral stigma of a judgment which no longer affects legal rights does not present a case or controversy for appellate review." *St. Pierre v. United States*, 319 U.S. 41, 43 (1943). Thus, Mejia has set forth *no* basis for federal jurisdiction. No matter how it rules on Mejia's present petition, the Court cannot redress any of those (putative) injuries to his legal rights. And any sense of stigma Mejia—wherever he now is—may feel about his conviction is not a cognizable injury under Article III.

### IV.   CONCLUSION

That a party possesses a litigable interest—and thus has a suit presenting a live case or controversy—is the *sine qua non* of federal jurisdiction. That interest cannot be divined "from averments in the pleadings, but rather must affirmatively appear in the record." *Spencer*, 523 U.S. at 10–11. Indeed, "it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts" demonstrating some real-world injury capable of redress by a favorable decision. *Id.* at 11. In this case, Mejia has offered no sound basis in the record—and not even averments in the pleadings—as to whatever collateral consequence he supposedly endures that this Court could redress. And thus, because there is no injury—real or apparent—sustaining federal jurisdiction over Mejia's petition, his claims are now **DISMISSED AS MOOT**.

A separate Order consistent with this Memorandum Opinion shall issue this date.

SIGNED this 23rd day of November, 2020.

                                                                                       Royce C. Lamberth
                                                                              United States District Judge

# APPENDIX A

## TRANSCRIPT OF PROCEEDINGS
## BEFORE JUDGE ROSEMARY M. COLLYER
## JULY 20, 2012

[The relevant exchange began at 11:27:40 AM on July 20, 2012.]

Courtroom Deputy: Criminal Action 10-256. United States of America v. Wilfredo Mejia. For the Government, William O'Malley, Laura Guinn, and Nihar Mohanty. Pleasant Broadnax for the defense. The defendant is present.

Mr. O'Malley: Good morning, Your Honor. First, I would like to apologize to the Court for delays this morning. I don't have, I don't know what happened and I know it's a very hectic day for the Court and . . .

The Court: Hectic for you and me, and you called me yesterday, and then you kept it a half-hour today, and I have to say I lost my temper at your colleagues.

Mr. O'Malley: Well that's fine with me, Your Honor . . .

The Court: But I don't have, I don't have time to talk about it now. So why don't we just proceed.

Mr. O'Malley: Yes ma'am.

The Court: Thank you.

Mr. O'Malley: I just wanted to advise the Court the last copy that the Court got of the proffer has some changes in it.

The Court: Well I'll go through this proffer rather than . . .

Mr. O'Malley: Well I just want to draw your attention to the—if you have the original signed copies now, the last sentence in the last paragraph was added at Mr. Broadnax's request on behalf of his client, and . . .

The Court: Yes, I understand.

Mr. O'Malley: And in the two paragraphs which discuss the events at the Taylor Street address, other than Mr. Mejia's name, so that no one would think that Mr. Mejia had provided any information, the other individuals are identified as "GM" through "G4" so . . . "GM1" through "GM4." The names correspond to the copy that the Court originally got.

The Court: Alright. Thank you, I appreciate that input. Mr. Broadnax, could you and Mr. Mejia please come forward.

Mr. Broadnax: Good morning Your Honor.

The Court: Good morning sir. Mr. Mejia, you're here today to enter a plea pursuant to an agreement with the United States. Before I can take your plea, I need to ask you a series of questions to make sure that you understand what you're doing and that your plea is voluntary. I'm going to have the courtroom deputy administer an oath to you whereby you promise to tell the truth, so that your responses to me will be truthful. Do you understand?

1

Defendant: Yes.

The Court: Thank you sir. Ms. White, please.

Courtroom Deputy: Please raise your right hand. Do you solemnly swear or affirm that you will well and truly answer all questions propounded to you by the Court, so help you God?

Defendant: Yes.

Courtroom Deputy: Thank you.

The Court: And Mr. Mejia, could you please tell us your whole name.

Defendant: My name is Wilfredo Adalberto Mejia.

The Court: And how do you spell your middle name and your last name?

Defendant: Adalberto is A-D-A-L-B-E-R-T-O.

The Court: Okay, and "Mejia."

Defendant: "Mejia" is M-E-J-I-A.

The Court: Thank you. We don't have a court reporter here. We have a recording system. So someone is going to be listening to the recording to make a transcript, and I thought it would be easier for them if you spelled your name so they wouldn't put it wrong in the transcript. How old are you Mr. Mejia?

Defendant: I am 26.

The Court: Some English.

Defendant: [Laughs.]

The Court: How many years of school do you have?

Defendant: Um, I finished 11.

The Court: Okay, did you finish 11 in the United States or at home?

Defendant: I was uh, I was trying to finish over here, I was going to school . . .

The Court: Here?

Defendant: Yeah.

The Court: Okay. When did you come to this country?

Defendant: I came in 2000.

The Court: Okay. And how old are you now?

Defendant: 26.

The Court: And you're from El Salvador, is that right?

Defendant: Yes.

2

The Court:   Okay.  Do you understand that if you plead guilty or if you are convicted of a crime, it might affect how long you can stay in this country?

Defendant:   Yes.

The Court:   Okay.  Are you here today under the influence of any alcohol?

Defendant:   No.

The Court:   Are you under the influence of any drugs, legal or illegal?

Defendant:   No.

The Court:   Alright.  Let me ask you, you have the plea agreement in front of you?

Defendant:   Si.  Yes.

The Court:   Yes?  That's okay, "si" works.  Um, it's six pages long.  Is this your signature on the last page?

Defendant:   Yes.

The Court:   Was this translated into Spanish for you?  Or do you understand the English?

Defendant:   English and Spanish.

The Court:   Okay.  So did you have a chance to talk to Mr. Broadnax about it?

Defendant:   Yes.

The Court:   And have you been satisfied with the advice and counsel that he has given to you?

Defendant:   Yes.

The Court:   Alright.  Can you tell me in your own words, if you can, what is the crime here?  It's a little confusing perhaps.  Do you know?

Defendant:   It's about a robbery in a place of prostitution.

The Court:   Okay, well what it really says is it's a conspiracy.  That is, you joined with other people, and MS-13, to commit various crimes.  And the conspiracy MS-13 is organized, so it has people in charge and people down at different levels, and that makes it a racketeering organization.  So you participated in a RICO conspiracy.  That's what it says on the fourth line there.  Do you see that?

Defendant:   Yes.

The Court:   And what that means is, it means we're talking about MS-13 as a gang, and you participated, and, in that participation, you were involved in armed robbery and also you possessed and brandished a gun during certain crimes.  Let me see which ones they are.  Well, it says that you brandished a firearm in connection with the crimes charged in Counts 2 through 22.  Count 2 charges the kidnapping of Maria Soto Trinidad.  Count 3 charges the assault of Ms. Solidad Trinidad—Soto Trinidad, excuse me.  Um, Count 3-, 4, is armed robbery.  Count 5 is kidnapping while armed.  Count 6 is kidnapping under D.C. law.  Count 7 is assault again.  Those things, and that in participation with that activity, you had a gun and showed it.  Do you understand that?

3

Defendant: Yes.

The Court: Okay. Now, the maximum sentence, the most time that you might spend in jail for participating in MS-13 is life. And then, for the gun charge, that is, using a gun during the kidnapping and robbery, you would have an additional seven years. Do you understand that?

Defendant: Yes.

The Court: Those are the—life is the maximum sentence. Seven years is a mandatory sentence. It's set by the law. Do you understand that?

Defendant: Yes.

The Court: Okay. And because you're pleading to the RICO conspiracy, you would have to pay a $100 special assessment as well. Do you understand that?

Defendant: Yes.

The Court: Now because you're entering your plea before trial, the government agrees that you should be sentenced to less time, because you have saved them the difficulty and time involved in going to trial. Do you understand that they think that I should lower your sentence somewhat because of your early plea?

Defendant: Yes.

The Court: And in fact, you and the government have reached a deal. And the deal is that I will sentence you to 141 months, which is just over eleven years. Do you understand that?

Defendant: Yes.

The Court: Okay. Now the way this works is, I don't know very much about you right now. Before sentencing, I will get a presentence investigation report. The probation office will do that. They'll come. They'll talk to you. You can have Mr. Broadnax there. You will see their report to me before I do, so if it has mistakes, you will have a chance to make corrections. [Someone begins coughing.] Sorry, she's not feeling very well. That's okay. Ready? Okay. And so, you'll get that report and I will too, and then we'll be ready for sentencing. Is it hurting your ears? [In reference to the coughing.]

Defendant: [Laughs.]

The Court: Okay. It's only at that point that I will know whether I agree with a sentence of 141 months. If I disagree, then you will have the chance, and the choice, to withdraw your guilty plea, because you have made a deal that says, "I will plead guilty if you make sure I only have to serve 141 months." But I'm the one who does the sentencing. So if I don't think 141 months is the right length of time, then you're not bound by your guilty plea, and you get to withdraw it. Do you understand that?

Defendant: Yes.

The Court: Okay. If that happens, and I don't know that it's going to, and I just don't know today. Do you understand? I don't know enough about you and the crime to be able to say. Do you understand that?

4

Defendant: Yes.

The Court: Okay. If I don't accept this plea, as I said, you can then withdraw your guilty plea. Or you can keep your guilty plea and negotiate a different sentence with the government that I might accept. Or you can say, "Okay judge, but you sentence me as you think you should, and I'm just gonna go ahead and take that sentence." You will have those choices. Okay?

Defendant: Yes.

The Court: Okay. Now, you've agreed that your plea will not lead to your being released from jail into D.C. Do you understand that?

Defendant: Yes.

The Court: Okay. In the United States, the Constitution guarantees every criminal defendant the right to go to trial. And if you go to trial, there's an important protection for you: you are presumed innocent. What that means is, in the United States, a criminal defendant does not have to prove he's innocent. Rather, the government has to prove he's guilty. And the government has to prove he's guilty beyond a reasonable doubt. And the government has to persuade twelve jurors, who have to be unanimous, they have to all agree, that the defendant is guilty beyond a reasonable doubt. So at trial, you have choices. You could challenge the government's evidence. Through Mr. Broadnax, you could question, cross-examine, their witnesses. You could put on witnesses in your own defense. You could testify for yourself if you wanted to. But you wouldn't have to do any of those things, because you're presumed innocent, unless and until the jury finds you guilty. A guilty plea is the same thing as a jury verdict. So you understand by entering a plea, you're giving up your right to go to trial?

Defendant: Yes.

The Court: Okay. In paragraph seven of the plea agreement, the parties—you and the government—through Mr. Broadnax, you and the government negotiated what your sentence would be under the Guidelines, which are recommendations for sentencing in U.S. federal courts. I am not bound by that analysis and it might be that when it comes time for sentencing, I will have looked at this and decided that, actually, it's wrong. But you have still agreed with the government that I will sentence you only to 141 months, and no more, and unless I tell you that's not enough, that will be your sentence. Do you understand?

Defendant: Yes.

The Court: Okay. I assume the 141 months includes the consecutive time for the gun?

Mr. Broadnax: Yes.

The Court: Okay, now if we get to sentencing and it turns out the sentence is more harsh than you hope, let's say I don't accept the 141 months and you go ahead and I sentence you to something that's more harsh than that, that would not be a reason for you to withdraw your guilty plea. Do you understand that?

Defendant: Yes.

5

The Court: But at the moment, the deal is 141 months. And it's only if I don't think that's enough that you have to worry about how much it would be, and then you'd have time to think about your choices. Do you understand?

Defendant: Yes.

The Court: Okay. And everybody agrees that if you need an interpreter, that one will be provided to you at the expense of the Court, like we have some today. Okay?

Defendant: Yes.

The Court: At the time we get to sentencing, the government will dismiss the other charges in the indictment that are against you. Except for the one that you're pleading guilty to. Do you understand that?

Defendant: Yes.

The Court: I have to make sure that there is a basis, a factual basis, for your guilty plea. And I have here the government's proffer of proof, that is, the facts they think support your plea. It's twelve pages long. Is that your signature, sir?

Defendant: Yes.

The Court: And was this document translated into Spanish for you?

Defendant: Yes.

The Court: Okay. I'm just going to summarize it quickly. But what it says, basically, is a description of MS-13 and the fact that you were a member of MS-13, which engaged in a lot of different kinds of illegal activities, including murder, attempted murder, narcotics distribution, robberies, extortion, stealing vehicles, threatening and intimidating witnesses, and things like that. Using telephones to talk to each other and to keep track of who was doing what. And then, on or about January 1 of 2008 through April of 2010, you participated in MS-13 and violated the laws by kidnapping, robbery, and extortion, as well as narcotics trafficking. And that the government's evidence would show that on December 11, 2009, you and four other members of MS-13 who are charged in the indictment, planned and committed an armed burglary and armed robbery, at 301 Taylor Street, a prostitution house. And that you were responsible for the plan to rob the people at the prostitution house and to force them to pay rent to MS-13. And that the other members, the other four members, entered the house with guns and knives and committed robbery and showed guns and then left with what they had stolen. However, the others known as GM1, GM2, GM3 and GM4, were eventually arrested by the government. It's important to note that none of the information or evidence in this proffer of proof was supplied to the United States by Mr. Mejia. He has kept silent. But the government has learned this information, and Mr. Mejia, you agree that if the case went to trial, the government would be able to prove your involvement in the robbery, extortion, murders, et cetera. Is that true sir?

Unknown: Not murder.

The Court: Not murders. Sorry, I misspoke. Let me back that up. Your involvement in the, uh, robberies at the, the burglary and robbery at the Taylor Street house of prostitution, and other activity that are in the proffer. That those things are true and could be proved?

6

Defendant: Yes.

The Court: Okay. Is there anything else that either party wishes me to ask the defendant?

Mr. Broadnax: Your Honor, just one correction, Your Honor asked the defendant if the proffer had been translated into Spanish. I think he may have misunderstood. He answered "yes." It has not been. Uh, I went to the jail and went over each paragraph with him in both the proffer and the plea agreement, and we discussed each paragraph after I read it to him. And I'm confident that he understood, and I think he would make that representation. But it had not been translated.

The Court: Okay. So, Mr. Mejia, you have talked to Mr. Broadnax about each of the paragraphs in the plea and in the proffer. And you are comfortable that you understand them and that they are true, is that right?

Defendant: Yes.

The Court: Mr. O'Malley?

Mr. O'Malley: Just to illuminate that . . .

The Court: You need to stand at the microphone, sir.

Mr. O'Malley: Yes, Your Honor. Just to illuminate that, uh, as the Court knows, certain changes were made at Mr. Mejia's request. Secondly, Your Honor, I don't know if it may be coming, but you had not as of yet, found Mr. Mejia competent. You asked the questions, but you didn't.

The Court: Is there—is there a question of his competence?

Mr. O'Malley: No there isn't, but . . .

The Court: Well I don't think there's a question. But I haven't finished yet, so. I'm still asking questions. We haven't gotten to the end. Alright, if nobody has other questions that they would propose, let me finish. Mr. Mejia, did anyone threaten you to get you to enter a guilty plea?

Defendant: No.

The Court: Did anyone promise you anything except what's in the plea agreement to get you to enter a guilty plea?

Defendant: No.

The Court: Is there a reason you would enter a guilty plea other than that you're guilty? That is, would you enter a plea because you're guilty, or for some other reason?

Defendant: I did not understand that.

The Court: Would you enter your plea because you are guilty, or for some other reason?

Defendant: I plead guilty because I am guilty.

The Court: Alright. Then I'm going to ask you formally. How do you plead to Count 1 of the indictment, which charges you with conspiracy to conduct and to participate in the affairs of an enterprise through a pattern of racketeering, that is, in MS-13, and with use and possession of a firearm in relation to a crime of violence, guilty or not guilty?

7

Translator: Could you repeat that?

The Court: It's long.

Unknown: And, Your Honor, it's Count 1 and Count 23.

The Court: Okay. Why don't we do it that way. How do you plead to Count 1, which charges you with conspiracy to participate in MS-13, and Count 23, which charges you with use and possession of a firearm, guilty or not guilty?

Defendant: Yes. [Speaks to translator.]

Translator: Guilty.

The Court: Thank you sir. The Court finds that the Defendant understands what he's doing and that his plea can be accepted. Is that what you wanted?

Mr. O'Malley: Yes, Your Honor, that was.

The Court: Good. Okay. Then we made it. I would put the proffer of proof together with the plea agreement as a single document. I also have the waiver of trial by jury, which has been signed by Mr. Mejia, Mr. Broadnax, and Mr. O'Malley, and which I will sign and date. Now Mr. Mejia, I need a pre-sentence report about you, so that I understand what you've done and where you came from and who you are, before I can sentence you and decide whether 141 months is the right sentence or not. As I told you earlier, the probation office will come and speak to you about that and ask you questions, and then you will get to see it before I do. Is there any reason to delay sentencing here?

Mr. Broadnax: No, Your Honor.

Mr. O'Malley: In fact we could discuss that we would like the earliest possible date so that Mr. Mejia could get into the federal system.

The Court: Get on with it. Get on with it. I understand. Ms. White, he will need about 70 days, Mr. Mejia, for the probation office to do the report. So if we could pick a sentencing date, and we'll order the report.

Mr. Broadnax: Your Honor, I would request a Friday, because I think during that period of time I may—scheduled to be in trial with Judge Lamberth.

The Court: I think we should understand that, yes.

Unknown: October the 5th at 10:15.

Mr. Broadnax: That's fine with me.

Unknown: That's fine with the government, Your Honor.

The Court: Alright, October the 5th at 10:15. Mr. Mejia, I will see you in October, okay?

Defendant: Thank you.

The Court: Thank you, sir. Good luck.

Mr. Broadnax: Thank you, Your Honor.

8

The Court:   Thank you.

[The relevant exchange ended at 12:00:20 PM on July 20, 2012.]