UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Case No. 1:10-cr-00256-RCL-3 |
| WILFREDO MEJIA, | |
| *Defendant.* | |

## MEMORANDUM OPINION

In December 2009, MS-13 gangster Wilfredo Mejia helped several associates rob a D.C. bordello. Proffer at 9–10, ECF No. 217. Police disrupted the robbery, but Mejia fled the scene. *Id.* at 10. He was captured a few months later. *Id.* Federal prosecutors then charged him with twenty-three offenses: five counts of assault with a dangerous weapon in aid of racketeering, kidnapping while armed, and armed robbery; four counts of kidnapping while armed in aid of racketeering; and single counts of RICO conspiracy, kidnapping in aid of racketeering, first-degree burglary while armed, and possession of a firearm during and in relation to a crime of violence. Third Super. Ind., ECF No. 101. In exchange for the government dropping twenty-one of those counts, Mejia admitted his guilt to all and pleaded guilty to two: RICO conspiracy and the firearms offense. Plea Agreement at 1, ECF No. 217. The Court sentenced Mejia to 141 months' imprisonment for those convictions, to be followed by 36 months of supervised release. Judgment, ECF No. 254. While imprisoned, Mejia moved to vacate his firearms conviction under 28 U.S.C. § 2255 and the Supreme Court's decision in *Johnson v. United States*. 576 U.S. 591 (2015). Mot., ECF No. 628. But as the parties were briefing that challenge, Mejia, a native of El Salvador, completed his prison term and was deported. Joint Dec. at 1–2, ECF No. 677.

Mejia is thus no longer in federal custody. *Id.* He isn't even in the country anymore. *Id.* Given his RICO conviction and his admission to committing his score of other felonies—facts Mejia left unchallenged in his § 2255 motion—he's permanently barred from ever re-entering the United States. Mem. Op. at 9–10, ECF No. 678; *see infra* 15–16. And though Mejia is nominally on "supervised release," probation officers recently explained that they don't monitor Mejia's activities. Prob. Mem. at 1–2, ECF No. 685. They don't know whether he's complying with release conditions like holding a job, abstaining from narcotics, or avoiding firearms. *Id.* They don't even know where he is. *Id.* So Mejia hasn't shown "any restraint on [his] liberty" or any other "litigable interest" at stake in this litigation. Mem. Op. at 7–8, ECF No. 678.

The Court accordingly declined to settle the abstract question whether Mejia's firearms conviction is valid. *Id.* at 10. Instead, relying on basic principles of Article III jurisdiction, it held the § 2255 motion moot. *Id.* But Mejia's lawyer insists that the motion is *not* moot, and he wants the D.C. Circuit to reverse and remand for this Court to consider the *Johnson* challenge. COA Mot. at 1–4, ECF No. 683. Even though a favorable ruling on that issue would have no practical effect on Mejia's life, it's apparently quite important to Mejia that the validity of his firearms conviction be adjudicated. Why? Counsel's theory seems to be this: Mejia's nominal "supervised release" period runs until June 5, 2023. *Id.* at 2. And *if* Mejia were to illegally immigrate back into the United States (re-entry bar be damned) and *if* Mejia were caught, he might be prosecuted for both illegal re-entry *and* for failure to obey his supervised release conditions. *Id.* at 3. That, in counsel's view, saves the § 2255 motion from mootness. *Id.* But the claim that this speculative chain of future lawbreaking supports Article III jurisdiction is wrong. In fact, it's so wrong that it's not even reasonably debatable. So the Court will **DENY** Mejia's requested certificate of appealability.

## I.      BACKGROUND

After his arrest and indictment for the 2009 bordello shakedown, Mejia and federal prosecutors worked toward a plea agreement. They reached one, and memorialized its terms, on July 20, 2012. Plea Agreement at 1, ECF No. 216. To secure the government's recommendation of a 141-month sentence, Mejia agreed to enter pleas of guilty on Counts One (RICO conspiracy) and Twenty-Three (the firearms offense), and to "admit his guilt in connection with the possession and brandishing of a firearm during and in connection with the crimes charged in Counts Two through Twenty-Two." *Id.* at 1–2. Mejia acknowledged that he and his lawyer had reviewed and assented to those terms and that he had signed the agreement "voluntarily and of [his] own free will." *Id.* at 6. He also agreed with and signed the government's description of his crimes in the accompanying factual proffer. Proffer at 12, ECF 217.

Mejia formally entered his guilty plea before the Court, Judge Rosemary M. Collyer presiding, on the same day. Min. Entry 7/20/2012; Appendix at 7–8, ECF No. 678. At the hearing, Judge Collyer took further steps to confirm that Mejia agreed with the plea and proffer. She had Mejia verify that his signature appeared on both, which he did, and she summarized their contents for him—"the burglary and robbery at the Taylor Street house of prostitution[ ]." *Id.* at 3–6. She queried whether "those things are true and could be proved," to which Mejia responded, "yes." *Id.* at 6–7. Satisfied that Mejia had entered the agreement voluntarily and that it was based in fact, Judge Collyer formally accepted Mejia's plea of guilty. *Id.* at 7–8. As Mejia himself explained, "I plead guilty because I am guilty." *Id.* at 7.

Judge Collyer sentenced Mejia for those crimes a few months later, in October 2012. Min. Entry 10/05/2012. For the RICO conspiracy conviction, Mejia received fifty-seven months' imprisonment. Judgment at 3, ECF No. 254. And for the firearms offense, he received a

consecutive sentence of eighty-four months' imprisonment, thus summing to the agreed upon, 141-month total. *Id.* Mejia also received two terms of supervised release, each for thirty-six months, to run concurrently after his release from prison. *Id.* at 4.

Three years later, the Supreme Court deemed unconstitutional part of a statute with language much like the provision codifying Mejia's firearms offense. *See Johnson*, 576 U.S. at 606 (decided June 26, 2015); *compare* 18 U.S.C. § 924(e)(2)(B), *with* 18 U.S.C. § 924(c)(3)(B). In response, Mejia filed a § 2255 "placeholder" motion in June 2016 levying a *Johnson* challenge to his firearms conviction. Mot., ECF No. 628. There, he promised to soon supplement that filing with a longer submission containing his legal arguments. *Id.* But his counsel did so only on June 3, 2020—after the passage of another four years. Supp. Mot., ECF No. 662. The government responded to that supplement in September, and the parties later exchanged several replies and sur-replies. *See* Response, ECF No. 671; Reply, ECF No. 672; Sur-Reply, ECF No. 673; Sur-Sur-Reply, ECF No. 675.

None of those filings gave any sustained treatment to the issue of mootness. But just two days after Mejia's counsel had submitted the June 3 "supplement," Mejia's prison term expired. Supp. Mot. at 5, ECF No. 662. He was then released to the custody of Immigration and Customs Enforcement (ICE) and was deported back to El Salvador on June 12. Joint Dec. at 1, ECF No. 677. The parties eventually notified the Court of that discovery months later, via a joint declaration in November. *Id.* They there explained that an ICE deportation officer had confirmed to the assigned Assistant United States Attorney that Mejia was no longer in the United States. *Id.*

Because now-deported Mejia pointed to no concrete injuries, actual or imminent, that the Court could redress even if it granted his § 2255 motion, the Court dismissed it as moot on November 23, 2020. Mem. Op. at 10–11, ECF No. 678. Mejia noted an appeal two days later, but

4

the Circuit held the appeal in abeyance and directed Mejia to seek a certificate of appealability in this Court. Not. of Appeal, ECF No. 680; Order of USCA, ECF No. 682. Mejia moved the Court for that certificate on February 19, 2021. COA Mot., ECF No. 683. The Court did not request a response from the United States, and the United States did not file one. Mejia's certificate-of-appealability motion is thus ripe for review.

In it, Mejia claims that this Court's mootness holding was erroneous for the following reasons. First, he says, deportation alone does not toll or arrest the running of a supervised-release period. COA Mot. at 1–3, ECF No. 683. (With that much, the Court agrees.) So, at least in some nominal sense, Mejia "remains on" supervised release. *Id.* at 1–2. And second, Mejia says, "if [he] were to return to the United States without authorization before June 5, 2023—the expiration [date] of his supervised release term—he would be penalized for committing an illegal reentry violation *and* also for failing to abide by his supervised release conditions." *Id.* at 3. For those reasons, supposedly, Mejia's original § 2255 motion still presents a live case or controversy. *Id.* at 3–4.

Upon reviewing those arguments, though, the Court found them non-responsive to the central question whether Mejia still endures any concrete injury from his firearms conviction that the Court could redress by granting his § 2255 motion. For while Mejia's supervised-release period may be ticking down, Mejia himself—far away in El Salvador—has never shown that this nominal release period actually imposes "any restraint on [his] liberty." Mem. Op. at 8, ECF No. 678. Such restraints would no doubt be concrete injuries under Supreme Court precedent, but Mejia points to none. *Cf. Spencer v. Kenma*, 523 U.S. 1, 7 (1998). Rather, he's simply broached the speculative possibility that he might illegally re-enter our country and thus that he might become subject to hypothetical future penalties. COA Mot. at 3, ECF No. 683.

5

So, to discern whether Mejia truly has any real-world "restraint on [his] liberty" from the nominal supervised-release period, the Court invited the Probation Office to detail the extent to which its officers are supervising Mejia. Mem. Op. at 8, ECF No. 678; Order, ECF No. 684. The Probation Office responded with a memorandum on April 20, 2021. Prob. Mem, ECF No. 685. There, Probation explained that it "does *not* monitor [Mejia's] daily activities in El Salvador." *Id.* at 2 (emphasis added). Unlike an offender on supervised release in the United States, then, Mejia has complied with *none* of the relevant release conditions. *Id.* The Probation Office has none of Mejia's drug tests, has received no international phone calls from El Salvador checking in, and has no proof that Mejia has lawful employment or is avoiding firearms. *Id.* All Probation does, apparently, is run Mejia's name once or twice a year to see whether any new arrests have appeared in its database. *Id.*[1] Probation thus re-affirmed that Mejia has no actual "restraint on [his] liberty" this Court could redress by granting his § 2255 motion. *Cf.* Mem. Op. at 8, ECF No. 678. And despite his (or, at least, his lawyer's)[2] desire to litigate that challenge, Mejia didn't dispute any of the Probation Office's memorandum.

The Court will explain below why those uncontested facts render Mejia's *Johnson* challenge not just moot, but not even arguably live. First, though, it details the standards governing adjudication of certificate-of-appealability motions.

---

[1] And merely having one's name in some database isn't alone a real-world injury-in-fact that can support Article III jurisdiction. *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 341–45 (D.C. Cir. 2018).

[2] An interesting question the D.C. Circuit might investigate is how Mejia authorized his lawyer's decision to appeal this case when no one, apparently, has seen or heard from Mejia since his deportation a year ago. *See Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000) ("[T]he decision to appeal rests with the defendant[.]"); *Legal Ethics*, LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 1.2–2(a) (2011–12 ed.) ("On these significant and central issues, such as the question of . . . whether to appeal, the client should have the final say."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 22(1) (2000) ("[T]he following and comparable decisions are reserved to the client[:] . . . whether to appeal in a civil proceeding or criminal prosecution[.]").

## II.    LEGAL STANDARD[3]

Passed in 1996, the Anti-Terrorism and Effective Death Penalty Act (AEDPA) sought to bring finality to criminal convictions by imposing "gatekeeping" mechanisms upon the waves of successive and often frivolous collateral attacks lodged in federal courts. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Felker v. Turpin*, 518 U.S. 651, 657 (1996); *see also* 110 Stat. 1214. Under its framework, defendants have "no absolute entitlement" to appeal the denial of their petitions. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003) (citing 28 U.S.C. § 2253). Rather, they must satisfy AEDPA's appellate gatekeeping mechanism by first obtaining a "certificate of appealability." *Slack v. McDaniel*, 529 U.S. 473, 480–81 (2000); *see also* § 2253. That certificate may issue "*only* if the applicant has made a substantial showing of the denial of a constitutional right." § 2253 (emphasis added). And without it, the defendant may not appeal—thus securing AEDPA's goal of keeping circuit courts' dockets free of meritless petitions.

In construing § 2253, the Supreme Court has counseled that courts should not issue certificates of appealability as "a matter of course." *Miller-El*, 537 U.S. at 337. But the defendant need not show that he would *succeed* on appeal. Rather, a defendant makes a "substantial showing of the denial of a constitutional right" when he "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 338. Thus, Mejia must show that "jurists of reason would find it debatable whether his petition states a valid claim of the denial of a constitutional right." *Williams v. Martinez*, 586 F.3d 995, 997–98 (D.C. Cir. 2009). Specifically, he must show that reasonable jurists would find debatable this Court's conclusion that his § 2255 motion is moot.

---

[3] The Court recently explained the legal standard governing adjudication of certificate-of-appealability motions in the case *United States v. Bogle*. *See* Order, ECF No. 102, *United States v. Bogle* (D.D.C. Jan. 11, 2021) (Case No. 1:95-cr-00298-RCL-1). The Court reproduces that discussion in its present "legal standard" section.

## III.   DISCUSSION

Mejia cannot make that showing, however, under basic principles of Article III jurisdiction. The Court illustrates that point in the three sections that follow. First, it sets out the justiciability principles that render Mejia's § 2255 motion moot. Second, it summarizes its earlier holdings on mootness and explains why those holdings—flowing from those basic jurisdictional principles— aren't reasonably debatable. And third, it shows why Mejia's present certificate-of-appealability motion, which relies on speculative arguments about future lawbreaking long-rejected by the Supreme Court, only underscores that this Court's mootness holdings aren't reasonably debatable.

### A. The Basic Article III Jurisdictional Requirements Governing This Case

Article III of the United States Constitution does not authorize federal courts to issue "advisory opinions" on abstract questions of law. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *see also* Richard H. Fallon, Jr. et al., *The Federal Courts and the Federal System* 50 (7th ed. 2015) (calling the advisory-opinion prohibition "an uncontroversial and central element of our understanding of federal judicial power"). Rather, federal courts' subject-matter jurisdiction extends only to live "cases" and "controversies."[4] U.S. Const., Art. III, § 2. As the Supreme Court has explained, "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser*, 422 U.S. at 401. Instead, the litigant invoking jurisdiction "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *United States v. Juvenile Male*, 564 U.S. 932, 938 (2011) (per curiam) (quoting *Spencer*, 523 U.S. at 7).

---

[4] And because mootness is thus a subject-matter jurisdictional defect, the Court must raise the issue sua sponte, just as it did in this case. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 78–79 (2013); *Gonzales v. Thaler*, 565 U.S. 134, 141 (2012).

To safeguard those jurisdictional limits, the Supreme Court has devised several "justiciability" doctrines that dictate when courts may adjudicate some litigant's grievance. Fallon et al., *supra*, at 49. The first relevant doctrine is "standing," which defines the sort of interest a litigant must possess to invoke federal jurisdiction at the suit's outset. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, the litigant (here, Mejia) must make three showings. First, he "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* (cleaned up). To satisfy the concreteness requirement, the complained-of injury must be "*de facto*"; that is, it must exist in the real world. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Purely legal injuries, by contrast, such as a defendant's bare violation of a statutory requirement without some independent, real-world consequence, do not suffice to establish standing. *Id.* at 1549. And for an injury to be actual or imminent, the litigant must point to something more than speculative "allegations of possible future injury." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). As for the second showing, "there must be a causal connection between the injury and the conduct complained of." *Def. of Wildlife*, 504 U.S. at 560. And third, "it must be likely . . . that the injury will be redressed by a favorable decision." *Id.* at 561.

This concrete and redressable injury-in-fact must also persist throughout the life of the lawsuit; if the injury vanishes, so too does jurisdiction. *Spencer*, 523 U.S. at 7. "*Throughout the litigation*," the Supreme Court has explained, the litigant "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* (emphasis added). By contrast, the suit becomes "moot" if the complained-of injury ceases or can no longer be redressed before the case becomes final. *Id.* For that reason, we

sometimes think of mootness as the standing requirement extended across a timeframe. Fallon et al., *supra*, at 199 (citing Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). To be sure, mootness and standing aren't exactly equivalent. *Id.* at 200. A couple of important mootness "exceptions" (capable of repetition yet evading review and voluntary cessation) can allow a suit to *continue*, even if the plaintiff couldn't have *started* the suit on those bases. *Id.*; *see also Friends of the Earth v. Laidlaw Env. Serv. (TOC) Inc.*, 528 U.S. 167, 190 (2000). But those exceptions aren't relevant here—Mejia invokes neither—so the standing-across-a-timeframe idea is a useful heuristic. In other words, Mejia must show that he *continues* to this day to have some concrete and actual (or imminent) injury-in-fact capable of redress by a favorable decision of this Court. Without that showing, the Court is powerless to entertain his *Johnson* challenge. *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).

Of special relevance here, there are also a few ways that Mejia *cannot* show a concrete and redressable injury under the Supreme Court's precedent. One is by pointing to the hypothetical possibility that he might violate an unchallenged criminal statute in the future and thus suffer some unwanted consequence—an argumentative strategy the Supreme Court has long rejected. *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). The Supreme Court's 1974 decision in *O'Shea v. Littleton* neatly illustrates that point. *Id.* There, respondents associated with the civil rights movement alleged that if they violated admittedly valid criminal laws, they might become subject to discriminatory due process and equal protection violations within the justice system of Alexander County, Illinois. *Id.* at 491, 497. Thus, they sought an injunction against those allegedly discriminatory practices. *Id.* at 492. But the Supreme Court explained that the respondents could not "show an existing controversy simply because they anticipate[d] violating lawful criminal

statutes and being tried for their offense, in which event they may appear before petitioners and, if

they do, [ ] be affected by the allegedly illegal conduct charged." *Id.* at 496–97.

The Supreme Court noted that this merely hypothetical injury "takes us into the area of

speculation and conjecture." *Id.* at 497. Indeed, the respondents lacked an account of why those

future events might unfold; they had no evidence of "specific threats . . . made against them." *Id.*

The Court was thus "unable to conclude that the case-or-controversy requirement [wa]s satisfied

by general assertions or inferences that in the course of their activities[,] respondents will be

prosecuted for violating valid criminal laws." *Id.* Further, the Court noted, it should be presumed

for standing purposes that litigants obey valid and unchallenged criminal laws—a presumption

obviating reliance on hypothetical future prosecutions. *Id.* As the Court explained, "[w]e assume

that respondents will conduct their activities within the law and so avoid prosecution and

conviction as well as exposure to the challenged course of conduct said to be followed by

petitioners." *Id.* Without evidence of any other purported interests at stake, the Court held the

respondents' challenge moot.

The Supreme Court reiterated those points a few years later in *Lane v. Williams*. 455 U.S.

624 (1982). There, respondents from Illinois pleaded guilty to burglary charges that, to their later

surprise, entailed mandatory parole. *Id.* at 625–27. They sought to challenge their parole terms as

due-process violations, since they hadn't known the terms were mandatory when entering their

plea agreements. *Id.* at 625. But as the case worked its way through the court system, their parole

terms expired. *Id.* at 628–29. The Supreme Court thus declared the due-process challenges moot.

*Id.* at 631–32. As it explained, "[r]espondents are no longer subject to any direct restraint as a

result of the parole term," and "their liberty or freedom of movement [was] not in any way curtailed

by a parole term that has expired." *Id.* at 631. They also pointed to no other continuing

consequences from the old parole terms. *Id.* at 632. "At most," all they could show was that if they were to commit some future crimes, be convicted for them, and then be sentenced, their old parole terms might affect those future sentencings. *Id.* at 632–33.

Just like in *O'Shea*, the Supreme Court rejected this hypothetical chain of future lawbreaking as a persuasive reason to exercise jurisdiction. "Parole violations that remain a part of respondents' records," it said, "cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent that from occurring." *Id.* at 632 n.13. Lacking concrete restraints on the respondents' liberty, and presented only with speculative claims about future violations of unchallenged criminal statutes, the Supreme Court held the case moot. *Id.* at 633–34; *see also Spencer*, 523 U.S. at 15 (similarly rejecting a purported litigable interest that hinged on future violation of unchallenged criminal laws). So once again, speculative claims about future criminality could not support Article III jurisdiction.

Turning to more recent cases, this Court would note that the longstanding principles detailed above accord with the Supreme Court's latest pronouncements on imminence and concreteness. On the latter issue, take the 2020 decision *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020). The case involved two defined-benefit-plan beneficiaries (also serving as class representatives) who alleged mismanagement by their plan's administrators. *Id.* at 1619. A declaration of mismanagement might have given these named plaintiffs some psychic satisfaction, or it might have helped the other, unnamed members of the class. *Id.* at 1620–21. But as the Supreme Court pointed out, the two *named* beneficiaries were entitled to exactly the same benefit disbursements no matter whether they won the suit or lost it. *Id.* at 1619. Because the case's result,

however it came out, couldn't affect the beneficiaries' real-world interests, they had "no concrete stake in th[e] lawsuit," and thus no Article III standing. *Id.* at 1619.

As for imminence, the Supreme Court's *Carney* decision likewise re-affirmed *Lujan*'s admonition that merely speculative, "'some-day' intentions" do not suffice to establish a concrete injury. *Carney v. Adams*, 141 S. Ct. 493, 502 (2020). *Carney* concerned a Delaware citizen who objected in principle to the Delaware judiciary's "political balance" requirement, but who had taken no significant steps to run for a judicial position himself. *Id.* at 496–97; 500–01. The Supreme Court held that it was without jurisdiction to adjudicate his First-Amendment challenge. *Id.* at 503. Indeed, it noted, entertaining a case in which the litigant's interest sounds in mere conjecture (rather than a concrete injury) "would significantly weaken the longstanding legal doctrine preventing [courts] from providing advisory opinions" incapable of affecting the rights of the litigants before them. *Id.* at 501. So now as then, a concrete and redressable injury-in-fact remains the *sine qua non* of federal jurisdiction.

### B. The Court's Holding That These Basic Principles Dictate That Mejia's § 2255 Motion is Moot Is Not Reasonably Debatable

In its dismissal of Mejia's § 2255 motion, the Court examined all the conceivable reasons that the motion might remain live, and it explained why none of those reasons even arguably defeated mootness. Mem. Op. 7–10, ECF No. 678. The Court reviews that analysis below. It also notes that Mejia's present certificate-of-appealability motion does not even contest the first three of the following holdings from the Court's earlier opinion; it disputes only the fourth, concerning supervised release. *See* COA Mot., ECF No. 683. In Part III.C of this opinion, the Court explains why that last, contested point obviously fails to rebut the mootness holding. But for now, the Court summarizes the *un*contested reasons why Mejia's motion does not present a live controversy.

*First*, the Court analyzed whether Mejia's firearms conviction might cause him to endure any "civil disabilities" that could be redressed by the conviction's invalidation. Mem. Op. at 8–9, ECF No. 678. The "civil disabilities" concept emerged from a couple of Supreme Court cases in the 1960s, which held that the mere expiration of a prison sentence does not automatically moot an attack on the underlying conviction. *See Carafas v. LaVallee*, 391 U.S. 234, 237 (1968); *Sibron v. New York*, 392 U.S. 40, 57 (1968). Rather, the conviction might still entail some litigable, "collateral consequences," given our society's practice of felon disfranchisement. *Sibron*, 392 U.S. at 56. These older Supreme Court cases also sometimes suggested that courts should *presume* the litigant might suffer such future consequences (thus satisfying the concrete-injury requirement) unless there were "no possibility" that those consequences would materialize. *Id.* at 57. Later on, the Supreme Court cast this presumption's validity into significant doubt. In its 1998 *Spencer* decision, the Supreme Court explained that ad hoc loosening of the imminence and concreteness requirements in the collateral-attack context has no basis in ordinary jurisdictional principles. *Spencer*, 523 U.S. at 10–11. And the Supreme Court has explicitly clarified that collateral consequences shouldn't be presumed when there *aren't* any civil disabilities the litigant might possibly face. *See Lane*, 455 U.S. at 632 n.13 (declining to presume collateral consequences where the record affirmatively dispelled their possibility).

Following those instructions, this Court examined whether there were any civil disabilities Mejia might endure that the Court could redress with a favorable ruling on his § 2255 motion. Mem. Op. at 8–9, ECF No. 678. If Mejia were a U.S. citizen, for instance, he might have a valid gripe that he couldn't vote, serve as a public official or on a jury, serve in the armed forces, or get certain business licenses. *Id.* But as the Court noted, none of these arguments makes any sense in the context of Mejia's specific case. *Id.* Mejia has an independent and unchallenged felony RICO

conviction that would disfranchise him all the same, irrespective of how the Court ruled on his § 2255 motion. *Id.* More importantly, Mejia is not just a felon, but a deported, non-citizen felon permanently barred from re-entry. *Id.*; *see also infra* 15–16. So there is no reason to suspect that he could one day engage in civic activities in the United States like voting or jury service but for his firearms conviction. To the contrary, he can't re-enter the United States *at all*. *Id.* And even if he could, he still couldn't engage in those civic activities even if the Court declared his firearms conviction invalid. So on those facts, there was no reason to conclude that Mejia had a live interest in combatting future civil disabilities via his § 2255 motion. Tellingly, Mejia doesn't challenge this holding in his present certificate-of-appealability motion.

*Second*, and relatedly, the Court noted that even if it granted Mejia's § 2255 motion, doing so wouldn't redress Mejia's permanent bar from re-entering the United States. Mem. Op. at 9–10, ECF No. 678. As the Court explained, 8 U.S.C. § 1182(a)(2)(A)(i)(I) bars the re-admission of "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime." *Id.* at 9; 8 U.S.C. § 1182(a)(2)(A)(i)(I). As part of his plea agreement and proffer, and during his allocution before Judge Collyer, Mejia admitted committing just such crimes. Plea Agreement, ECF No. 216; Proffer, ECF No. 217; Appendix at 6–7, ECF No. 678. Indeed, as the Board of Immigration Appeals (BIA) and various Circuits have held, both assault with a dangerous weapon and racketeering are crimes involving moral turpitude. *See Safaryan v. Barr*, 975 F.3d 976, 979 (9th Cir. 2020); *Matter of Jing Wu*, 27 I. & N. Dec. 8 (BIA 2017); *Estrada-Rodriguez v. Lynch*, 825 F.3d 397, 405 (8th Cir. 2016); *Smalley v. Ashcroft*, 354 F.3d 332, 338–39 (5th Cir. 2003). Mejia was also *convicted* of the latter crime via his plea bargain, which is yet another avenue to

15

inadmissibility under § 1182(a)(2)(A)(i)(I). Judgment at 1, ECF No. 254. Mejia has never challenged the validity of *that* conviction, nor that of his related admissions to his other felonies. *Cf. Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 406 (3d Cir. 2020) (holding a § 2254 petition moot in analogous circumstances). Mejia's present certificate-of-appealability motion also doesn't contest that he's permanently barred from re-entering the United States, irrespective of how the Court rules on his § 2255 motion. So just as with the civil-disabilities argument, he'll have forfeited that issue on appeal too. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1170 n.6 (11th Cir. 2017).

*Third*, the Court noted that Mejia's possible psychic dissatisfaction with the chance that his old firearms conviction is invalid, or any moral stigma he might feel from that conviction, are not sufficient bases for Article III jurisdiction. Mem. Op. at 10, ECF No. 678. As the Supreme Court explicitly held in *St. Pierre v. United States*, "the moral stigma of a judgment which no longer affects legal rights does not present a case or controversy for appellate review." 319 U.S. 41, 43 (1943). As always, what matters is a concrete injury—not the mere desire to litigate abstract issues untethered to real-world effects. And like with the civil-disabilities and re-entry bar points, Mejia also declines to dispute this third holding in his present certificate-of-appealability motion.

So what *does* Mejia dispute? As the Court mentioned above, Mejia's (lawyer's) gripe with the Court's mootness holding—in other words, why that holding is reasonably debatable—hinges entirely on the issue of supervised release. *See* COA Mot. at 1–4. His argument, it turns out, isn't remotely persuasive. But since it's the sole ground that Mejia raised in support of his request for a certificate of appealability, the Court devotes a full section below to explaining why it contradicts basic principles of Article III jurisdiction.

16

> *C. Mejia's Sole Ground For a Certificate of Appealability—The Speculative Possibility of Future Punishment For a Supervised Release Violation After a Hypothetical Illegal Re-Entry—Only Underscores that This Court's Dismissal of Mejia's § 2255 Motion As Moot Is Not Reasonably Debatable*

In his effort to secure a certificate of appealability, Mejia channels all his energy into a single, two-part syllogism. First, he argues that the Court erred when it held that Mejia "is not . . . on supervised release" given his deportation to El Salvador. COA Mot. at 2, ECF No. 683. Deportation alone, he says, does not terminate or toll the running of a supervised release period. *Id.* at 2–3. And second, in the attempt to explain why this nominal release period invests him with a concrete interest in his *Johnson* challenge, Mejia argues as follows: Since the supervised-release period is still running, "if Mr. Mejia were to return to the United States without authorization before June 5, 2023—the expiration [date] of his supervised release term—he would be penalized for committing an illegal reentry violation *and* also for failing to abide by his supervised release conditions," one of which was to not illegally re-enter. *Id.* at 3. Thus, Mejia says, his § 2255 motion isn't moot, and this Court must decide the merits of his *Johnson* challenge.

But each premise of that syllogism is dead wrong. Take first Mejia's insistence that deportation alone cannot toll or terminate the running of a supervised-release period. *Id.* at 2–3. The Court agrees. Its prior opinion never claimed that deportation stops the running of a supervised-release period, and its mootness holding in no way hinges on that assertion. To the contrary, the Court held that Mejia "no longer [had] any restraint on [his] liberty from supervised release" *because his release is not being supervised.* Mem. Op. at 8, ECF No. 678. Sure, his term of supervised release continues to exist in some nominal, abstract sense, given that his original release period will continue to tick down until June 2023. *See* COA Mot. at 2, ECF No. 683. But as the Probation Office has explained, it's not actually monitoring Mejia's activities in El Salvador.

Prob. Mem. at 1–2, ECF No. 685. He's not being held to his supervised release conditions like providing drug tests or proof of employment, and the Probation Office isn't taking any action for those omissions. *Id.*

What Mejia's trying to do, really, is confuse the issues by relying on a terminological ambiguity surrounding the phrase "supervised release." Supervised release ordinarily refers to both a time period set out in a court's criminal judgment *and* to several conditions the defendant must obey within that period, under the Probation Office's supervision. In the ordinary case, the supervised release *period* and the supervised release *conditions* go hand-in-hand: The defendant must abide by the release conditions so long as the release period continues to tick down. But in Mejia's case, his deportation severed the release *period* from the release *conditions*. Though the release *period* continues to run, Mejia is not actually subject to any release *conditions*—the liberty restraints present in an ordinary case that would create a concrete injury supporting Article III jurisdiction. *Cf. Spencer*, 523 U.S. at 7.

Mejia is not the first defendant to exploit that terminological ambiguity in the attempt to avoid a mootness holding. Take the Tenth Circuit's decision in *United States v. Vera-Flores*. 496 F.3d 1177 (10th Cir. 2007). There, while an illegal-alien defendant named Vera-Flores was challenging his sentence in the federal courts, he was deported to Mexico. *Id.* at 1178. Vera-Flores insisted his case was not moot, since "any errors in sentencing could be corrected on remand by a reduced term of supervised release." *Id.* at 1180. But the government pointed out that the deportation "rendered [the] supervised release term a practical nullity." *Id.* And the Circuit agreed. As it explained,

> Vera-Flores served his sentence and has been deported. Although legally subject to a three-year term of supervised release, Vera-Flores is presumably in Mexico. While outside the United States, Vera-Flores has no obligation to report to a probation officer and is

not under the supervision or control of the United States Probation Office. In short, Vera-Flores'[s] liberty is in no way affected by any sentencing error allegedly committed by the district court[,] because Vera-Flores'[s] deportation has eliminated all practical consequences associated with serving a term of supervised release. Vera-Flores does not, therefore, have an actual injury likely to be redressed by a favorable judicial decision, even assuming *arguendo* that Vera-Flores states valid claims on appeal which would be likely to result in the modification or elimination of his supervised release term on remand. [. . .] Because this court determines Vera-Flores has sustained no actual injury which this court can remedy and because Vera-Flores has failed to demonstrate the presence of any collateral consequences . . . this court concludes Vera-Flores'[s] removal has rendered his appeal moot.

*Id.* at 1180–81.

So too here. Mejia invokes the mere running of the supervised-release term without linking it to any "actual injury" or any restraint on his liberty that term entails. *Cf. id.* But precisely as the Tenth Circuit explained, what matters for the mootness analysis is *not* whether some nominal period of supervised release continues to run in a deported alien's absence. *Id.* What matters, following basic justiciability principles, is whether the alien has an "actual injury likely to be redressed by a favorable decision." *Id.* Much like Vera-Flores didn't make that showing, Mejia hasn't either. So much like Vera-Flores, Mejia can't avoid mootness merely by pointing out that his supervised-release term happens to be ticking down.

Tacitly conceding that merely labeling the present period "supervised release" isn't alone sufficient to support Article III jurisdiction, Mejia proceeds to the second step of his syllogism. COA Mot. at 3, ECF No. 693. If he "were to return to the United States without authorization before June 5, 2023—the expiration [date] of his supervised release term," he says, "he would be penalized for committing an illegal reentry violation *and* also for failing to abide by his supervised release conditions," one of which was to not illegally re-enter during the supervised-release period.

*Id.* So maybe it's *that* hypothetical future prosecution, Mejia says, that makes the Court's earlier mootness holding reasonably debatable.

Where to begin? How about concreteness. As the Court explained above, merely raising some abstract legal gripe isn't sufficient for Article III jurisdiction. Rather, there must be some independent, "actually existing," "*de facto*," concrete injury the litigant seeks to vindicate. *Spokeo*, 136 S. Ct. at 1548. But Mejia's certificate-of-appealability motion essentially concedes that no such injury now exists.[5] Indeed, despite his protestation at his syllogism's Step One that he's still "on" supervised release, he doesn't point to *any* present restraint on his liberty from that nominal release period. So he doesn't have any present injury that the Court could redress with a favorable ruling on his § 2255 motion.

Instead, Mejia points to the hypothetical *future* injury of a prosecution for supervised-release violations if he were to illegally re-enter before June 2023. COA Mot. at 3, ECF No. 683. But that argument obviously fails under the Supreme Court's longstanding precedent. Since Mejia asserts no *actual* injury, the threatened future prosecution must be "imminent"—there must be at least a "substantial risk" of its occurrence. *Amnesty Int'l USA*, 568 U.S. at 409, 414 n.5. To illustrate that risk, Mejia points to a hypothetical chain of future lawbreaking. COA Mot. at 3, ECF No. 683. He may decide to illegally re-enter the United States, at which point he may be caught. *Id.* He may then be prosecuted, and that prosecution may include counts not just for illegal re-entry, *see* 8 U.S.C. § 1326, but also for supervised-release violations. COA Mot. at 3, ECF No. 683.

---

[5] A related but important point is that Mejia isn't seeking purely retrospective relief (that is, money damages) for some past injury. If that were the case, standing and mootness wouldn't hinge on whether Mejia also demonstrated the threat of another, future injury. He'd already have shown a concrete and actual injury in the past, and thus his case could proceed. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). But this case is different. Mejia wants his firearms conviction invalidated, apparently, because of the *prospective* injury of a future prosecution. COA Mot. at 3, ECF No. 683. Hence why the Court must analyze whether that purported future injury is sufficiently concrete and imminent to support jurisdiction.

Not only is that chain the sort of "conjecture" the Supreme Court has long disapproved in a general sense, but it's *precisely* the set of inferences that the Supreme Court has explained over and over is insufficient to show a litigable interest.[6] Recall *O'Shea*. There, the Court held that the respondents could not "show an existing controversy simply because they anticipate violating lawful criminal statutes and being tried for their offense." *O'Shea*, 414 U.S. at 496–97. To the contrary, such future criminality took the Court into the area of "speculation and conjecture," *id.* at 497—the definitional antithesis of a sufficiently "imminent" injury for Article III jurisdiction. *Def. of Wildlife*, 504 U.S. at 560 (explaining that the relevant injury must be "actual or imminent, not 'conjectural'"). Moreover, since the respondents had an independent obligation to obey those criminal laws, the Court presumed that they would follow them. *O'Shea*, 414 U.S. at 497. In other words, they could not manufacture jurisdiction by threatening to violate unchallenged statutes. *Id.*; *see also Lane*, 455 U.S. at 632 n.13.

---

[6] The only appellate case Mejia cites in his certificate-of-appealability motion that appears to support his claims is *United States v. Rivas-Gonzalez*, 365 F.3d 806, 809 (9th Cir. 2004). There, the Ninth Circuit permitted an illegal alien to continue challenging his sentence post-deportation because, the Circuit postulated, he might some day re-enter and then "be required to comply with the conditions of his yet unserved two-year term of supervised release." *Id.* at 809. This luxurious view of the case-or-controversy requirement apparently hinged on the Circuit's claim that though "the likelihood of Rivas's reentry into the United States is speculative," that fact was "of no moment." *Id.* The Circuit provided no further explanation of why a merely "speculative" stake in a lawsuit suffices for Article III jurisdiction. And that omission is unsurprising, since the view that a merely speculative future injury suffices for such jurisdiction is patently erroneous. Tellingly, the Circuit did not even attempt to distinguish such cases as *O'Shea, Lane,* or *Spencer*. *See* 414 U.S. at 496–97; 455 U.S. at 631–32; 523 U.S. at 15. The only supporting Supreme Court case the Circuit cited was *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983). But that case was readily distinguishable from the situation the Ninth Circuit confronted. There, two aliens were prosecuted and convicted for drug offenses and then deported. *Id.* at 583. The Fifth Circuit reversed the convictions on appeal, *id.*, and then *the government*—not the aliens—appealed to the Supreme Court to have the convictions reinstated. *Id.*; *see also* 581 n.2. The Court held that the case wasn't moot given *the government's* litigable interest in re-instating the aliens' convictions. *Id.* That holding was correct, since the government has a classic litigable interest in securing convictions for violations of its laws. *See* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695–701. Further, if the government prevailed at the Supreme Court, it was *certain*, not speculative, that the win would vindicate those governmental interests. But that has nothing to do with the scenario where the *alien* seeks to invoke federal jurisdiction and does so only based on speculative potential interests. The Ninth Circuit failed to recognize or appreciate this distinction, and so declined to perform a basic jurisdictional analysis to determine whether a case or controversy still existed. Because *Rivas-Gonzalez* is patently erroneous, it does not suffice to make this Court's mootness holding reasonably debatable.

Those principles apply here with full force. Mejia has an independent obligation not to violate our laws by illegally re-entering. *See* 8 U.S.C. § 1326. For that matter, he'd have the same obligation whether or not his supervised-release term were lifted. The Supreme Court has thus directly instructed lower courts not to heed the very arguments Mejia now makes.

So what's Mejia's response to all this? Nothing, really. He cites several cases to bolster the irrelevant point that deportation alone doesn't toll a supervised release period, thus futilely attempting to claim that this Court's mootness holding "conflicts with other courts" that have held that supervised-release terms continue to run after deportation. COA Mot. at 3, ECF No. 683. But there's no "conflict," since this Court agrees with those other holdings. What matters for the justiciability analysis—just as this Court said on the first go-around—is not whether the supervised release period continues to run in some abstract sense, but whether it actually imposes "any restraint on Mejia's liberty." Mem. Op. at 8, ECF No. 678. Mejia's present certificate-of-appealability motion has done a lot to answer that question, just not in the way Mejia thinks. Far from revealing some real-world interest that could support adjudication of his *Johnson* claim, Mejia's present motion musters only a speculative chain of future lawbreaking as the sole interest he has in that challenge. That chain is not just ephemeral and conjectural. It's barred by unambiguous Supreme Court precedent.

## IV.    CONCLUSION

Wilfredo Mejia is a convicted felon, a resident of El Salvador, permanently barred from ever re-entering the United States, and an unpunished shirker of supervised-release conditions. If the Court granted his § 2255 motion, none of those facts would change. He would still be a felon, still be residing in El Salvador, still be barred from re-entry, and still be following no supervised-release conditions. His § 2255 motion is moot, and his arguments against that conclusion aren't

even reasonably debatable. So his certificate of appealability will be **DENIED**. A separate Order

consistent with this Memorandum Opinion shall issue this date.

SIGNED this 26th day of May, 2021.

Royce C. Lamberth
United States District Judge